## MATTHIAS v. BEECHE et al.

### THE ASPHODEL.

(District Court, E. D. New York. November 9, 1901.)

1. SHIPPING—CHARTER—PRIOR REPRESENTATIONS.
    Representations made by a shipowner prior to a charter respecting the speed of his vessel, but which are not embodied in the charter, are superseded by that instrument, in the absence of fraud or mutual mistake.

2. SAME—BREACH OF CHARTER—EVIDENCE CONSIDERED.
    Evidence considered, and held insufficient to sustain the claim of a charterer that the owner failed to maintain the vessel's machinery in proper condition, as required by the charter, resulting in loss of speed, and consequent lengthening of the voyage.

3. SAME—OBLIGATIONS OF OWNER UNDER CHARTER—FURNISHING ELECTRIC LIGHTS FOR DISCHARGE OF INFLAMMABLE CARGO.
    It is doubtful whether a charterer can require the shipowner to furnish electric lights to facilitate the discharge of a cargo which by reason of its inflammable nature cannot be handled safely by the use of lamps, and, at any rate, a claim for damages for delay which might have been thereby prevented will not be allowed where no demand was made on the master to furnish such lights.

In Admiralty.

Ivins, Kidder & Melcher and Benjamin J. Downer, for Beeche et al.

Convers & Kirlin and J. Parker Kirlin, for the Asphodel.

THOMAS, District Judge. In the above actions, shipowners seek to recover a balance of unpaid charter hire, and the charterers libel

the vessel for alleged nonfulfillment of the charter. The charterers pleaded false, but not fraudulent, representations respecting the speed of the vessel, which in fact preceded and are not embodied in the charter party, and are superseded by that instrument, in the absence of fraud or mutual mistake. This rule applies to usual contracts (Seitz v. Refrigerating Mach. Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837 [see cases cited in the opinion]; De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536, 33 L. Ed. 896; Wilson v. Cattle Ranch Co., 20 C. C. A. 241, 73 Fed. 994, 999; Godkin v. Monahan, 27 C. C. A. 410, 83 Fed. 116; Lawrence v. Steamboat Co. [C. C.] 12 Fed. 850; Union Nat. Bank v. German Ins. Co., 18 C. C. A. 203, 71 Fed. 473, 476; Reid v. Glass Co., 29 C. C. A. 110, 85 Fed. 193; Buckstaff v. Russell, 25 C. C. A. 129, 79 Fed. 611), and hence to bills of lading and charter parties (The Golden Rule [C. C.] 9 Fed. 334; Baker v. Ward, 3 Ben. 499, Fed. Cas. No. 785; Rawson v. Lyon [D. C.] 23 Fed. 107; Petrie v. Heller [D. C.] 35 Fed. 310; The Lakme [D. C.] 93 Fed. 230). The charterers also allege, although quite indefinitely, failure to maintain the vessel's machinery, which by the undertaking fell to the duty of the owners. Upon the trial the charterers pointed out that by the engineer's log book the registrations of the vacuum of the condenser were abnormally low, and showed by the evidence of an expert that this indicated loss of horse power, hence decreased speed, and urged that by the delay injury accrued to the charterers: The court, by somewhat careful collocation of facts from the engineer's and deck logs, arrived at an apparently accurate conclusion that as a general rule, to which there was some exception, an abnormally low registration of the vacuum accompanied higher rates of speed, and that the vacuum decreased while the revolutions of the engine increased. This ascertainment is seen by the following table, which shows the averages of speed during the service, rejecting the period when the charterers furnished coal alleged to be inferior. To the different rates of speed as thus averaged are related the averages of the registration of the vacuum, fuel consumption, pressure on boilers, grade of expansion, and revolutions of the engine that accompanied such several rates of speed:

| Speed. | Vacuum. | Fuel Consumed. | Pressure on Boilers. | Grade of Expansion. | Revolutions. |
|--------|---------|----------------|----------------------|---------------------|--------------|
| 9.1375 | 15.865  | 20.56          | 156.04               | 23.62               | 55.45        |
| 8.414  | 16.16   | 20.02          | 155.5                | 23.34               | 55.33        |
| 8.     | 17.24   | 19.111         | 156.815              | 25.637              | 56.009       |
| 7.53   | 16.32   | 21.16          | 150.16               | 24.01               | 55.01        |
| 6.7    | 18.51   | 21.28          | 152.72               | 23.77               | 52.76        |
| 5.61   | 18.7    | 20.61          | 148.92               | 22.85               | 51.1         |
| 4.1    | 18.759  | 18.38          | 147.5                | 22.96               | 47.70        |

This result seems to oppose the undoubtedly correct theory that a decreased vacuum tends to cause decreased speed, and that a high-

er rate of revolutions is accompanied, under usual circumstances, by a higher and more complete vacuum. Therefore the parties were asked, by argument or evidence, to advise the court concerning this seeming antagonism of fact and principle. The several parties met the inquiry as follows: The owner furnished evidence that the gauge of the condenser was defective and did not register correctly, thereby accounting for the apparent aberrations of the condenser. The charterers showed by the evidence of White, who became the vessel's chief engineer in October, after the expiration of the charter in August, and after a sale of the vessel, (1) that under normal conditions a diminished vacuum in the condenser should accompany higher speeds, and a decrease of speed should be accompanied by an increase of vacuum; (2) that a vacuum generally increases when the revolutions of the engine decrease; (3) that about a month after the vessel's return, during which she was substantially unused, he (White) found the tubes in the boiler so choked with salt as to impair the capacity some 25 per cent., and that her condenser contained 72 pounds of grease, which impaired its action, and that there were other more serious deficiencies, all of which, as he stated, must have existed for several months; (4) that the principal cause of diminished energy was the condition of the boiler, and that the condenser also contributed; (5) that the defects decreased the vessel's capacity at least 1 knot per hour, or even as much as from 24 to 30 knots in 24 hours; (6) that, after he substantially had corrected the unfavorable conditions, the vessel, in his charge, in a voyage of 16 days, made an average speed of 7.8 knots per hour, the average going east being 7 knots, including rough weather. The log for this history was not produced. If the evidence of White is understood (for his intended meaning is not clear), the variations of the vacuum in its relation to the speed and revolutions, as shown in the above summary, are similar to what they should be in the case of a normal condenser, save that the vacuum should at all times register higher. A high rate of speed and a high number of revolutions accompany a depressed vacuum, and a low rate of speed and a lower number of revolutions are accompanied by a more complete vacuum. Such is the apparent result of White's testimony. All this to the lay mind seems inconsistent with the mechanical theory and fact that the less complete the vacuum, as indicated by increased registration, the greater the loss of power, which power is dependent on revolutions, and results in speed. If White's theories be incorrect, his credit is impaired. If they be correct, then the condenser seems to have acted normally in the tendency of its operation. In the uncertainty it is just to lay aside the registrations of the vacuum, in the disposition of the question whether the machinery was maintained properly, and look to the remaining evidence for guidance. The evidence of White shows that the boiler was so incrusted with salt that its capacity was decreased 25 per cent., and that this loss of power was increased by a grievously neglected condenser. Is this evidence true? In the first place, it may be noticed that, after correcting the defects of which he complained, White did not obtain in actual use the 25 per

cent. of gain which he says was lost by the condition of the boiler, because he made but 7.6 knots per hour during the 16 days selected by him, while under the charter the vessel steamed 45 days, 13 hours, and 18 minutes, through a distance of 8,246 nautical miles, averaging 7.41 knots per hour. This was from New York to Coronel, with heavy head winds and head seas during the greater part of the time, as the log shows; and coming east from Coronel to New York she steamed 49 days, 8 hours, and 21 minutes, through a distance of 8,607 miles, or 7.09 knots per hour, which is slightly better than White did when coming in the same easterly direction; and the vessel under charter did this after the use of Coronel coal supplied by the charterers, which the captain states was inferior to that stipulated in the charter, and injurious to the boilers. This history would seem sufficiently to dispose measurably of the error and exaggeration of the witness White. But the evidence of other witnesses adds to the disbelief in his evidence. In October, White states that he found the defects of boiler, condenser, and valves, of which those relating to the boiler were most effective to cause loss of speed. In September, after the return of the vessel, the boiler was cleaned by Hannan & Co., of Brooklyn, whose foreman stated that all the tubes, save a few disused and capped, were cleaned thoroughly under his supervision. McKay, the chief engineer, states that this was done to his satisfaction; and, above all, Mancor, a Lloyd's surveyor at this port, a man of approved skill and recognized integrity, examined the boilers on September 10th for the purpose of the vessel's classification at Lloyd's, and testified that the boiler was in "very good condition; very fair condition." If these witnesses should be believed, White is discredited as to the condition of the boiler; and, if he may not be trusted respecting the boiler, he is untrustworthy in the matter of the condenser, which by his own account was the smaller factor in the impairment of speed. The varying evidence concerning the boiler may not be solved on the charitable theory of error. The difference is too radical. The statements of Mancor, Hannan, and Mc-Kay merit preference. The vessel made some 20,745 miles, passing through the Straits of Magellan in going and coming, and, proceeding as far north as Peru, returned, entering many ports, and averaged nearly $7\frac{1}{2}$ knots per hour. This is about three-tenths of a knot per hour less than White made on a short voyage of 16 days, after having put the vessel in repair, as he says; and the disparity is not unreasonable, considering the difference in the distances and vicissitudes. Moreover, allowance should be made for the breakage, disorder, and suspension of the machinery, such as occurred on or about from July 16th to 20th and August 2d, when the speed was very much reduced. Such loss is not deductible under the terms of the charter, as it is not shown to have been caused by neglect.

In arriving at the conclusion that the speed obtained indicates a reasonable fulfillment of the charter in the matter of the maintenance of the machinery, the cogent and careful argument by the charterers' advocate has not been disregarded, nor at all points does the conclusion remove difficulties and doubts raised by it. Indeed,

the inference to be drawn from the statement of the captain that the vessel did not make average time on the inward voyage, because of the inferiority of the Coronel coal, gives rise to much hesitation respecting the disposition of the case, inasmuch as, while the inferiority of the Coronel coal is undoubted, the evidence of the injury or loss of time arising therefrom is not altogether satisfactory. Nevertheless the vessel did as well on her long inward voyage as she did with White when eastward bound, and, on the whole, the charterers do not appear to have sustained the burden of pointing out where the defect, if any, was. The winch broke down for a few hours in New York. There is no evidence of trouble or delay therefrom elsewhere, and, under the charter, deduction may not be made for it, as the suspension of the work did not fall within the time stated in the charter, which should suspend the continuance of the hire.

The captain forbade the use of kerosene lamps to unload the nitrates. The prudence of this act does not seem to be disputed. It is doubtful whether the ship was obliged to supply electric lights. In any case, the charterers, their agents or contractors, should have pointed out the facilities needed, and demanded the same of the ship. It is questionable whether it was the duty of the owners to anticipate and tender peculiar provision for lighting, necessitated by the inflammable nature of the cargo.

The master of the vessel is entitled to a decree for the balance of the charter money, with interest and costs. The action against the ship is dismissed, without costs.